## WARREN TELECHRON CO. et al. v. WALTHAM WATCH CO.

### No. 3194.

Circuit Court of Appeals, First Circuit.

June 30, 1937.

On Rehearing Aug. 31, 1937.

Harrison F. Lyman, of Boston, Mass. (Russell A. Warner, of Schenectady, N. Y., and Rowland V. Patrick and Fish, Richardson & Neave, all of Boston, Mass., on the brief), for appellants.

Herbert A. Baker, of Boston, Mass., for appellee.

Before WILSON and MORTON, Circuit Judges and MORRIS, District Judge.

MORTON, Circuit Judge.

This is an appeal by the plaintiffs in two patent cases from decrees for the defendant entered on final hearing in the District Court. The patents involved are No. 1,334,423 to Warren for an indicator for electrically driven clocks dated March 23, 1920, expired since suit was brought, and No. 1,892,552 to Holtz for alternating current motor and means of controlling the speed thereof dated December 27, 1932, application filed October 1, 1921.

As to the first patent: The defenses were that the patent was void for lack of invention and that the defendant's device did not infringe. Electric clocks operated on public lighting circuits are subject to the defect that they stop when the current stops, and when the current comes on again they resume operation without any indication of the stoppage—and may therefore be seriously misleading. It occurred to the patentee that this defect could be cured by arranging an indicator or telltale, normally kept out of sight by magnetic attraction excited by the operating current and so arranged as to drop when the current failed. He embodied his idea in a more elaborate device in which a pendulum arrangement was held up by the magnetism of the clock motor. When released by the failure of the magnetism (on the cessation of the current) it swung back and forth for a short time and, if the current came on within 6 or 8 seconds, was recaptured by the magnetism of the motor and held in normal nonshowing position. If the stoppage of current lasted longer, the magnetic force when the current returned was no longer capable of recapturing the

pendulum and it accordingly came to rest in a position showing that the clock had been stopped. The defendant does not use the pendulum construction. In its device the indicator shows if the current has stopped at all.

The present question is whether the broad claims covering the basic principle of the patentee's device are valid. The prior art shows no such apparatus. It was concededly a new idea to apply such an indicator to an electric clock; the patent is in this respect a pioneer patent. The District Judge thought the device in its essential particulars so simple as to be of doubtful patentability; but he decided the case on the ground that the patent was not infringed.

The difference between the plaintiff's device and the defendant's device on which he rested this finding is in substance that in the plaintiff's apparatus the force of gravity is used to bring the indicator into showing position after the current has failed; while in the defendant's device a light spring performs the same function. The District Judge held in effect that on such a simple device of doubtful patentability the patentee should be limited to the exact construction of the patent. This does not seem to us to be sound. There was no prior art by which to limit the claim. The force of gravity and a spring, when they accomplish the same result in substantially the same way, have long been regarded as typical equivalents. "Indeed, the interchangeable use of weights and springs is the stock illustration for equivalents." Coxe, J. Kenney Mfg. Co. v. Mott Iron Works (C.C.) 137 F. 431, 433. To the same effect Imhacuser v. Buerk, 101 U.S. 647, 656, 25 L.Ed. 945; Mueller Furnace Co. v. Groeschel (C.C.) 166 F. 917, 918–920. They are so in this case. The claims in suit are not limited to constructions operated by gravity; their language equally includes springs. If Warren's idea, of an indicator held out of sight by the current and dropped into position when the current failed, is patentable he ought not to be deprived of the benefit of his invention by a device which merely substitutes the pull of a spring for the pull of gravity.

Whether Warren's essentially simple device involves invention is a close question. The quality which constitutes invention is indefinable, as has often been said. McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800. It depends on a judicial estimate of the intellectual qualities of the group mind of those engaged in a given art, made in the light of what may be called common knowledge. It is a matter of feeling rather than of logic. There must be something not found in the mind of the skilled workman, an originating quality most frequently noticeable in works of art. Noticing a defect in existing apparatus, or the chance or need of improvement in it, is the first step in invention. That was clearly present here. Warren realized that electric clocks as then constructed were unreliable, because nobody could tell, without continuously watching them, whether they had been stopped for some period. Having noticed the defect the means to overcome it were not difficult. Electric indicators arranged to drop into showing position on breaking the controlling current were old. At the same time Warren solved the problem with great directness and simplicity by using the magnetism of the motor to control his indicator, as does the defendant. While the art of electric clocks was at that time a rather new art, the defect in question was present and nobody before Warren had thought of his simple and effective way of curing it.

The file wrapper and contents show that the Examiner gave the matter careful and competent attention. The patents which he first cited against the application were not anticipations, as he later recognized, and are not now relied on as anticipations. He concluded that the application, notwithstanding the simplicity of the device, showed invention. His judgment is not to be set aside unless we are satisfied that he was wrong and that the step which Warren took was obvious to anybody in that art. The District Judge held the patent valid and with some hesitation we reach the same conclusion. We are not prepared to say that a skilled workman in that art would have both noticed the defect in electric clocks to which the invention relates and would have found such a simple and direct way to overcome it. The claim of this patent in suit is valid and infringed.

As to the second patent: The defenses are invalidity of the patent for lack of invention and other reasons and that the defendant does not infringe. This patent is on an induction-reaction subsynchronous motor of constant speed for use on alternating currents. Such motors consist of field or stationary magnets having what is called "shaded" poles, i. e., poles each of which is divided, one part being wound with an extra coil of insulated wire in series with the

rest. The effect of this is to cause the magnetic impulses to lag slightly in the shaded portion. In such a field when it is subjected to alternating current, the magnetic waves change rapidly and progressively, the lines of force are said to "rotate" around the field in which the rotor turns. It was well known that when a closed circuit in the rotor was cut by these lines of force a current was set up in it and that this current was attracted to, or "tended to follow," the lines of force by which it was created. This is the principle on which the induction element in the Holtz rotor rests. It was also known that if a rotor was provided with projections or "polar pieces" of iron or steel, the magnetic waves from the field magnet would tend to lock into them, provided the rotor was turning at nearly the speed at which the waves went by, and to pull around such rotor at the speed of the alternations. This, very simply stated, is the principle of the reaction element in the Holtz rotor. One weakness of the reaction motor is that it is not self-starting, but must be brought nearly up to the speed of the magnetic waves before it will lock to them.

These principles had been worked out before 1900, largely by the great inventors Tesla and Elihu Thompson. With respect to the reaction motor they had noticed and mentioned "a tendency to synchronize" the revolutions of the rotor with the alternations of the current (Thompson 1890). It should be observed, however, that between "a tendency to synchronize," and the precise continued synchronization essential to a timepiece is a long step. Coerper (1894) refers to this characteristic of reaction motors and says that the rotor "does not run at synchronous speed. It runs sometimes quicker but oftener slower than the speed which corresponds 'to the synchronous speed' of the same." Warren in 1918 patented an improvement in self-starting synchronous motors. In the patent it is said "that synchronous motors of the type referred to have strong starting and *moderate synchronizing* characteristics," etc. (Italics supplied.) We have been referred to no patent before the Holtz application which refers to "constant speed" as one of the qualities of the motor shown. Nor does the prior art show any self-starting constant speed subsynchronous motor before Holtz. As has been said the principles on which induction and reaction motors operated had been worked out, and patented so far as they could be, by 1900 or about that time.

But the earlier patents of Tesla and Thompson were largely theoretical. Much remained to be done in applying their discoveries in a practical way. The prior art contained many suggestions of a theoretical and rather indefinite character pointing to the result which Holtz achieved, but it does not show any motor which would perform like his, nor is any such motor described in the prior art. Many models were introduced and some were operated or attempted to be operated at the trial which were said to represent the construction of the early patents. As to several of them there was sharp dispute whether they were made in accordance with the specifications of the patents which they were supposed to represent. The District Judge said of them "With respect to all of these motors it appeared that there had been a departure from the patents with respect to the relative proportion of the various ingredients entering into the armature and that such departures were necessary in order that the motors should operate as self-starting synchronous motors." The defendant very pertinently suggests that if Thompson or Tesla had invented such a motor their large experience in such matters would have led them to recognize the value of it and to mention it in their patents, but there is no reference to any device having the Holtz characteristics.

In 1928, after the Holtz motors are said to have been on the market, but before the patent had issued, the *defendant* undertook to develop a self-starting constant speed, subsynchronous motor for use in electric clocks. It employed a patent attorney to look into the patent situation and he furnished it with copies of the various patents here relied on as anticipations of Holtz and suggested work along those lines. The defendant now says that such a motor was obvious at that time. Nevertheless, its engineers with these patents before them and the facilities of its workshops at their disposal worked on the problem for about three years without success. Mr. Balzer, who came into the defendant's organization in 1931, finally accomplished it, and the defendant had him apply for a patent on his result which it now holds. It is claimed by the plaintiff that the Balzer motor infringes the Holtz patent. Neither the defendant's experience nor its conduct indicates that the Holtz patent was void of invention. The Holtz application went through a hard fought interference with Rowe in the Patent Office. There was no

suggestion at that time of lack of invention. The Patent Office with all the prior patents now relied on before it granted the patent; and its action was affirmed by the Court of Custom and Patent Appeals. The office record of the patent is impressive.

With respect to the question of invention, the District Judge said: "Even with this experimentation and adjusting the Thompson motors did not operate with entire satisfaction, but I find, that with the skill of an expert in electrical matters the teachings of Thompson, of Wightman or Tesla would have enabled one, after experiments, adjustments, and modifications respecting size and proportion and ratios, to have constructed a self-starting sub-synchronous motor without any of the learning of Holtz."

"What Holtz apparently did was to take the well-known single phase induction motor with a split phase field and add to the induction element of the rotor a star-plate of hardened steel, to secure a lock-in through the reaction torque at a speed less than that corresponding to the speed of the field." He held the Holtz patent void for lack of invention.

We think this view is not tenable. The defendant's own experience shows that the District Judge was in error in supposing that a skilled expert with the Thompson, Wightman, and Tesla patents before him could have built the Holtz motor. It involves more than merely assembling parts of old devices. The field is a delicate one; slight changes often proved of great consequence. The effect of the induction element in the rotor is to step up the motor beyond the desired speed. Holtz was the first to discover that the successful operation of motors of this character depends on a careful balance between the induction and the reaction elements in the rotor and that the reaction element must be so designed as to control the tendency of the induction element to overspeed it. This certainly was not obvious nor was it a mere matter of adjustment and modification of existing machines. A period of nearly thirty years elapsed after the Thompson and Tesla patents relied on as anticipations during which no motor like that of Holtz appears to have been made, though it seems likely that during much of the interval there was a market for one. The Warren patent of 1918 contains the first suggestion of proportioning or adjusting the elements of the rotor but not we think in such form as to anticipate Holtz.

Holtz states the essence of his invention as follows: "So far as I am aware, I am the first in the art to provide for maintaining the speed of an alternating current motor having an induction rotor approximately constant under a constant frequency of alternations of the alternating current supply by magnetically interposing resistance to the attainment by said rotor of its free running speed, and therefore, this mode of operation as well as the apparatus by which it may be practiced are claimed generically as my invention." We think that this statement is warranted and that the District Judge fell into clear error in holding that the Holtz patent was void for lack of invention.

The defendant contends that Holtz practiced fraud on the Patent Office respecting the construction and tests of a Thompson motor, and that the plaintiff does not come into court with clean hands. The District Judge found against the defendant on this issue and we see no sufficient reason to doubt the correctness of his conclusion. The defendant also made a number of objections to the Holtz patent on technical grounds. They have been carefully considered, but none of them seems to be well founded nor to require discussion.

As to infringement, many claims are in suit. That which the plaintiff relies on as typical is claim one which reads as follows: "An alternating current motor provided with a field member for producing a strongly pulsating, shifting magnetic field and a rotatable secondary member arranged to be influenced by said field, said secondary member having a short-circuited winding thereon and a magnetic circuit designed to have polar effects and proportioned to oppose and overcome the torque produced by said short-circuited winding at a definite synchronous speed below that corresponding to full synchronism." It is conceded, and we think the concession unavoidable, that the defendant's motor "corresponds with the letter of various claims of the patent" and that it "does secure the result contemplated by the claims." It is urged, however, that the defendant's motor which does not have the separate reaction star-piece does not embody the principle of the Holtz patent. It does however embody all the elements of claim one proportioned as Holtz specifies. In other words, it embodies the principle of the Holtz invention. The star-piece is not an essential part of the invention; its function might be performed in other equivalent ways. Notwithstanding, the contrary opin-

ion of the District Judge, we think that the defendant's motor clearly infringes. The plaintiff's expert, Mr. Dawes, testified that in his opinion the defendant's motor embodies the elements of each of the claims in suit. There was no opposing testimony. The parties have not discriminated between the different claims in argument.

The decree below must be vacated and the case remanded with instructions to enter a decree for the plaintiffs on all the claims in suit.

The decrees of the District Court are vacated, and the case is remanded to that court with instructions to enter decrees for the plaintiffs on all the claims in suit; the appellants recover costs of appeal.

## On Petition for Rehearing.

### PER CURIAM.

In its petition for rehearing, the defendant urges strongly that we misconceived the prior art; that Holtz did no more than to embody its teachings in a self-starting subsynchronous motor of constant speed when the demand for such a motor arose; and that the monopoly which he seeks far exceeds any reasonable relation to the contribution to the art which he made. These questions have been carefully re-examined.

It is alleged that we fell into error in assuming that the Tesla patent was considered by the Patent Office or the Court of Customs and Patent Appeals; that it was not considered; and that "accordingly the presumption of validity arising from the grant of the patent is worthless"; that "the Tesla patent taken with the Tesla publication shows that Tesla taught the public in 1894 the very thing to which the court ascribes the success of the Holtz patent." The Tesla patent is urged as a complete anticipation of Holtz. The Tesla publication is quoted:

"*If it is desirable to secure a constant speed,* and at the same time a certain effort at the start, this result may be attained in a *variety of ways.* For instance, *two armatures,* one for torque and the other for synchronism, may be fastened on the same shaft and *any desired preponderance* may be given to either one, or an armature may be wound for rotary effort, but a *more or less pronounced tendency to synchronism* may be given to it by properly constructing the iron core; and *in many other ways.*" (Italics supplied.)

And also the Tesla patent:

"In such an arrangement as this, it is obviously desirable for economical and other reasons that a *proper relation* between the speeds of two motors should be observed."

The Tesla device to which these quotations refer consisted of two motors side by side on the same shaft with separate fields, and separate rotors. One motor had a rotor of the "torque," or induction, type; the other of the reaction, or "synchronizing," type. There was an arrangement to switch the current from one set of fields to the other after the motors had been started—although it was stated that this was not essential and both fields might be left in circuit. The polar projections of the synchronizing armature were wound with closed coils. It is a long way from the Tesla device to the simplicity and effectiveness of Holtz. We are wholly unable to agree that the Tesla patent and the publication referred to anticipated in an inventive way the simple compact structure of the Holtz motor. Undoubtedly it was known before Holtz that reaction rotors could be made which when brought nearly up to the speed of an alternating current would lock into step with it. Coerper explains and shows this. The observation quoted from this patent in the opinion states the general view of the art three years after the Tesla patent (1891). The Warren patent also refers to the general understanding of the art many years later. One difficulty with such motors appears to have been that they had very little torque, i. e., very little power to overcome resistance. The Holtz rotor provides in a single element the torque essential to overcome resistance and maintain the desired speed, and at the same time subjects this torque to the locking-in power of the reaction element. The suggestion in the Tesla publication that this could be done by two armatures and that in a single armature "a more or less pronounced tendency to synchronizism may be given by properly constructing the iron core" can by no means be regarded as anticipation of the Holtz device. It seems to us much more than an obvious application of well-known principles.

At the hearing in the District Court efforts were made to show that motors built according to prior patents would perform like the Holtz motor. They were unsuccessful. The finding of the District Judge on this point referred to in our opinion is high-

ly significant on the practical state of the prior art.

The facts show clearly that, as was said in the opinion, there was a potential demand for a motor having the Holtz characteristics as soon as public lighting circuits were standardized and accurately timed.

The allegation in the petition, that the defendant's difficulties in designing a motor were erroneously stated in the opinion and that its employee Fink designed one promptly in 1928 when the problem was presented to him, ignores the facts that only six of the Fink motors were ever built and none of them was ever sold. Clearly the Fink motor did not solve the problem, and the defendant's employees continued their efforts. The challenged statement is accurate.

By inadvertence, shaded poles were incorrectly described in the opinion on page 473. The sentence beginning, "Such motors consist of field or stationary magnets having what is called shaded poles" is changed to read:

"Such motors consist of field or stationary magnets having what is called 'shaded' poles, i. e., poles each of which is divided, one part of the face of the pole being shaded from the armature."

In other respects the statements of fact in the opinion appear to be correct. And upon careful re-examination, our conclusions of fact and our rulings of law appear also to be correct. The Holtz invention lay in devising a motor having a single field and also a single rotor or armature in which were combined an induction element which made it self-starting and provided torque to keep it up to speed against frictional or other resistance, and a reaction element which controlled the speed and kept the rotor in step with the alternations of the current. This had never been done or described before Holtz, and we think it involved invention.

This view of the Holtz patent may require discrimination between its claims. Some of those in suit may not be valid. There has been no finding on this point by the trial court and it was not argued before us. Instead of remanding the cause with instructions to decree for the plaintiffs on all the claims in suit, it will be better, we think, to vacate the decree of the District Court and remand for further proceedings not inconsistent with the opinion, including as part of it this memorandum.

The decree of this court of June 30, 1937, is vacated. The decrees of the District Court are vacated, and the case is remanded to that court for further proceedings not inconsistent with the opinion of June 30, 1937, as modified by this opinion. The appellants recover costs of appeal. The petition for rehearing is denied.